IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CORBIN L. LAMBERT,<br><br>Defendant. | Civil Action No.<br><br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1. This case is about a "cherry-picking" scheme carried out by investment adviser representative ("IAR") Corbin L. Lambert ("Defendant" or "Lambert").

2. Lambert is an IAR with Continuum Financial, LLC ("Continuum"), a Nebraska-registered investment adviser firm. As is the case at many advisory firms, Lambert block-traded securities on behalf of his clients in an "omnibus account," and then allocated each trade to individual client accounts. Because these allocation instructions may be submitted to the brokerage firm after trades are executed, an adviser using an omnibus account to trade has the opportunity to "cherry-pick"—that is, to allocate the winning trades to some favored accounts, and allocate the losing trades to other disfavored accounts. That is exactly what Lambert did.

3. Over more than a yearlong period from at least January 2017 through March 2018, Lambert engaged in a "cherry-picking" scheme, block purchasing securities in the form of options in Continuum's omnibus account, but delaying the allocation of those securities to individual accounts until after he had observed the securities' price movement during the rest of the trading day. With the benefit of that

COMPLAINT                                    1

knowledge, Lambert disproportionately allocated profitable trades to his personal account and disproportionately allocated unprofitable trades to his clients' accounts. Lambert's favored personal account enjoyed first-day trading profits and positive trading returns, while his clients suffered first-day trading losses and negative trading returns. By engaging in this cherry-picking scheme, Lambert violated the fiduciary duties he owed to his clients as an IAR, and violated the antifraud provisions of the federal securities laws.

4.      Lambert, Continuum's former chief executive officer ("CEO") and for a time its chief compliance officer ("CCO"), also made material misrepresentations to his investment advisory clients in Continuum's Forms ADV, which he reviewed, approved, and signed. Lambert represented that in placing certain types of trades, Continuum would ensure fairness; would not engage in trading that operated to disadvantage clients; and would employ documentation and review protocols to prevent conflicts of interest. These representations were false because Lambert's cherry-picking scheme was not fair to clients and disadvantaged them. In addition, Continuum did not document Lambert's conflicted options trading, nor did it conduct periodic reviews of block trading.

5.      Continuum's custodian broker-dealer for its client accounts was Charles Schwab & Co., Inc. ("Schwab"). In February of 2018, Schwab's internal fraud alert system detected that Lambert was using Continuum's omnibus trading account to day trade options for his personal account, to the detriment of his clients. Schwab confronted Lambert with its suspicions the following month. Lambert informed his partners that Schwab had contacted him but misled them as to why they contacted him. Schwab terminated Continuum in April 2018 from its trading platform. Lambert's partners subsequently removed him as the firm's CEO once Lambert's partners learned of his improper trading allocations, though he remains an IAR with Continuum.

6. By engaging in this cherry-picking scheme, and through his misrepresentations to his advisory clients, Lambert violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; Sections 17(a)(1) and 17(a)(2) of the Securities Act of 1933 ("Securities Act"); and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act").

7. With this action, the SEC seeks permanent injunctive relief against Lambert to prevent future violations of the federal securities laws, disgorgement of ill-gotten gains along with prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209 (e)(1) and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-9(3)(1) & 90b-14.

9. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

10. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Lambert resides in this judicial district.

## DEFENDANT

11. **Corbin L. Lambert**, age 47, is a resident of Lincoln, Nebraska, and an IAR with Continuum. Lambert initially founded Continuum in 2007 as a sole proprietorship under a different name. In 2016, Lambert and two partners formed

Continuum, and Lambert became the firm's CEO, a position he held until early 2020. Until April 2017, Lambert was also Continuum's CCO. From 2015 to the present Lambert has also been a registered representative with Securities America, Inc. (CRD 10205), a registered broker dealer. Lambert holds Series 7, 24, 26, and 66 securities licenses.

## RELATED ENTITY

12. **Continuum Financial LLC** is a Nebraska limited liability corporation with its principal place of business in Omaha, Nebraska. It is a registered investment adviser with the State of Nebraska. In March 2016, Lambert and two partners incorporated Continuum as a limited liability corporation. According to its most recent Form ADV dated March 23, 2020, Continuum as of that time had $39,919,521 in assets under management and 216 clients, all individuals.

## FACTS

A. **Background**

13. Lambert and two partners formed Continuum in 2016, with Lambert assuming the roles of CEO and CCO.

14. Continuum has been registered with the State of Nebraska as an investment adviser since May 1, 2015.

15. Lambert and each of his partners own an equal stake in Continuum, with each partner owning a one-third share.

16. According to Continuum's Form ADV dated February 22, 2017, Lambert was a principal owner, management person, CEO and CCO of Continuum.

17. From January 2017 through March 2018, Continuum's assets under management grew from $28.7 million to $35.6 million. According to its most recent Form ADV, dated March 23, 2020, Continuum's assets under management rose to $39.9 million.

18. Continuum currently has over 200 clients and manages all accounts on a discretionary basis, charging a fee of 2.5% of assets under management.

COMPLAINT                                                     4

19.     Lambert and each of his two partners each oversee their own advisory clients at Continuum.

20.     As to Lambert's clients, he had sole responsibility to direct and manage the trading in the clients' accounts.

21.     Lambert was the only person to place options trades in his clients' accounts.

22.     Lambert and his partners each received compensation from Continuum in the form of a percentage of the firm's advisory fees, in relation to the portion of the firm's assets under management attributable to each IAR's respective clients.

23.     During the relevant time period, Lambert maintained a personal account at Schwab (the "favored account").

24.     At all relevant times, Lambert was an investment adviser, as defined by Section 202(a)(1) of the Advisers Act.

25.     At all relevant times, Lambert provided investment advice to clients in exchange for advisory fees based on a percentage of assets under management.

26.     At all relevant times, Lambert directly benefitted from the advisory fees that Continuum received, as he received a portion of Continuum's profits.

27.     As an investment adviser, Lambert owed a fiduciary duty to his advisory clients to act for the clients' benefit, including an affirmative duty of utmost good faith and full disclosure of all material facts, as well as a duty to avoid misleading his advisory clients.

**B.     Defendant Unfairly Allocated Favorable Options Trades to His Personal Account, to the Detriment of His Clients**

28.     Lambert breached his fiduciary duties to his advisory clients by engaging in an undisclosed cherry-picking scheme involving options trading.

29.     Lambert's scheme began no later than January 2017 and continued through at least March 2018.

30. In general, an omnibus trading account allows an investment adviser to buy and sell securities on behalf of multiple clients simultaneously, without identifying to the broker in advance the specific accounts for which a trade is intended.

31. Lambert was able to disproportionately allocate trades by buying options in the omnibus trading account earlier in the day and then allocating the purchase later in the day, generally just before or after the market close.

32. Lambert used the time between the purchase and the allocation to see if the price of the option went up or down.

33. If the option price went up, Lambert generally allocated the purchase to his account.

34. In many instances, Lambert sold the option that same day by selling it near the close of trading out of the omnibus account.

35. Lambert then allocated both the purchase and sale, and the profit on that trade, to the favored account.

36. If, however, the option price went down, Lambert was more likely to allocate the purchase to his advisory clients' accounts (the "disfavored accounts").

37. If the relevant option's price closed higher, Lambert generally allocated the trade to the favored account, thereby receiving an unrealized gain.

38. In some instances, Lambert purchased and sold the securities on the same day, thus locking in a realized gain or loss, and then disproportionately allocated profitable trades to the favored account, and unprofitable trades to the disfavored accounts.

39. For example, at 2:28:51 p.m. on January 31, 2018, Lambert placed a purchase order in the omnibus account for 30 contracts of SPY put options expiring on February 9, 2018 with a strike price of $281.50 for $2.16. The price rose, and after the price had risen by over 18 percent at 3:27:22 p.m., he closed out the position and immediately allocated the entire trade to himself. The sale price that day was

$2.56, yielding a riskless first-day profit of $1,200.

40. Conversely, when the option's price went down over the course of the day, Lambert generally allocated the purchase to the disfavored accounts, leaving those accounts with unrealized first-day losses.

41. For example, between 1:05:16 p.m. and 1:54:29 p.m. on November 16, 2017, Lambert placed a series of 2 purchase orders in the omnibus account totaling 60 contracts for SPY call options expiring on November 17, 2017 with a strike price of $259.00 for an average price of $0.3733 and a total investment of $2,239.80. The price declined over the course of the day, closing at $0.215. At 4:08:45 p.m. that day just after market close, Lambert allocated the entire position to a client account, saddling that client with an unrealized first day loss of $949.80, or 42 percent on that investment.

42. From January 2017 through March 2018, Lambert's favored account enjoyed $37,042 in first-day profit, for a 4.40% return, with a 51 percent rate of profitable trades.

43. By contrast, during the same time period, the disfavored accounts suffered $141,642 in first-day losses, for a -12.56% return, with a 39 percent rate of profitable trades.

44. During the relevant period, Lambert's favored account was allocated 39 of the 50 most profitable trades and 22 of the 50 least profitable trades, while the disfavored accounts were allocated 20 of the 50 most profitable trades and 37 of the 50 least profitable trades.

45. Lambert knew, or was reckless or negligent in not knowing that he was disproportionately allocating profitable trades to his personal account and disproportionately allocating non-profitable trades to his clients' accounts.

46. The likelihood that Lambert's disproportionate allocation of profitable and losing trades resulted from random chance, as opposed to knowing and intentional conduct, is, at best, less than one in twenty.

47. At a minimum, Lambert failed to act reasonably when determining how to allocate trades.

### C. Schwab's Termination of its Relationship with Continuum and Lambert's Related Deceptive Acts

48. Continuum generally executed and allocated trades through an online platform provided by Schwab.

49. On or about March 5, 2018, three representatives of Schwab told Lambert in a phone call that they had concerns about the allocations of profitable trades between Lambert and his clients.

50. Specifically, one of the Schwab representatives told Lambert that it appeared Lambert was allocating profitable day trades to his personal account and allocating unfavorable trades to Continuum's clients.

51. Shortly after the March 5th call, Lambert informed his partners he had received a phone call from Schwab.

52. However, Lambert misleadingly told his partners that Schwab's concerns were with mechanical aspects of Lambert's omnibus account trading, concealing that Schwab's concerns involved Lambert's allocation of profitable trades to his personal account, as compared to allocations to clients' accounts.

53. In April 2018, Schwab terminated Continuum from its platform.

54. After they learned of the information communicated to Lambert by Schwab on March 5th, Lambert's partners removed Lambert as CEO and as a manager of Continuum.

### D. Defendant's Misrepresentations in Continuum's Forms ADV

55. A Form ADV is a brochure for investment advisory firms. It consists of two parts—Part 1 contains "check-the-box" information about the firm, and Part 2 is a brochure, in narrative form, which describes key information about the firm, including the types of services the firm provides. The Form ADV is filed with, and accessible on, the Investment Adviser Registration Depository ("IARD"). The

publicly available website for the Nebraska state Department of Banking and Finance provides a link directly to the IARD search function for registered investment advisers.

56. Continuum prepared Forms ADV for the relevant time period.

57. The Forms ADV were provided to Continuum's clients by Lambert and his partners.

58. Lambert reviewed each Form ADV prepared by Continuum's outside compliance consultant, and authorized each final version for filing.

59. During the relevant period, Lambert provided his clients with the Form ADV Part 2A to his clients annually.

60. Lambert signed at least some of Continuum's Forms ADV Part 2A before providing them to clients.

61. Continuum's Forms ADV Part 2A during the relevant period contained the following disclosures:

(a) <u>Investing Personal Money in the Same Securities as Clients</u>: From time to time, representatives of [Continuum] may buy or sell securities for themselves that they also recommend to clients. This may provide an opportunity for representatives of [Continuum] to buy or sell the same securities before or after recommending the same securities to clients resulting in representatives profiting off the recommendations they provide to clients. Such transactions may create a conflict of interest. [Continuum] will always document any transactions that could be construed as conflicts of interest and will never engage in trading that operates to the client's disadvantage when similar securities are being bought or sold.

(b) <u>Trading Securities At/Around the Same Time as Clients' Securities:</u> From time to time, representatives of [Continuum] may buy or sell securities for themselves at or around the same time as clients. This may provide an opportunity for representatives of [Continuum] to buy or sell securities before or after recommending securities to clients resulting in representatives profiting off the

recommendations they provide to clients. Such transactions may create a conflict of interest; however, [Continuum] will never engage in trading that operates to the client's disadvantage if representatives of [Continuum] buy or sell securities at or around the same time as clients.

(c) <u>Aggregating (Block) Trading for Multiple Client Accounts</u>: If [Continuum] buys or sells the same securities on behalf of more than one client, then it may (but would be under no obligation to) aggregate or bunch such securities in a single transaction for multiple clients in order to seek more favorable prices, lower brokerage commissions, or more efficient execution. In such case, [Continuum] would place an aggregate order with the broker on behalf of all such clients in order to ensure fairness for all clients; provided, however, that such trades would be reviewed periodically to ensure that accounts are not systematically disadvantaged by this policy.

62. As Lambert knew or was reckless or negligent in not knowing, these representations in Continuum's Form ADV, Part 2A brochures were materially false and misleading, because:

(a) Lambert's cherry-picking scheme was not fair to clients and disadvantaged them;

(b) Continuum did not document Lambert's options trading; and

(c) Continuum did not conduct periodic reviews of block trading.

63. Lambert's advisory clients would have found it important to know in deciding whether to do business or to continue to do business with Lambert, that he was trading options in his personal account in a manner that unfairly disadvantaged their accounts.

64. Lambert's advisory clients would also have found it important to know, in deciding whether to do business or to continue to do business with Lambert, that Continuum was not documenting potentially conflicted trades not conducting periodic review of block trading, to prevent unfair, disadvantageous trading practices

such as Lambert's cherry-picking scheme.

### E. Lambert's Scienter

65. Lambert knowingly or recklessly engaged in a fraudulent scheme to cherry-pick securities trades for the benefit of the favored account and to the detriment of the disfavored accounts.

66. Lambert further acted unreasonably when carrying out his cherry-picking scheme.

67. Lambert also knew, or was reckless or negligent in not knowing, that Continuum's Forms ADV were false and misleading when they claimed Continuum's advisers would not engage in trading that disadvantaged clients; that the firm would document transactions that could be construed as a conflict of interest; and that the firm would periodically monitor the advisers' use of block trading.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Lambert)**

68. The SEC realleges and incorporates by reference paragraphs 1 through 67 above.

69. As alleged above, Defendant, with scienter, engaged in a scheme to defraud clients, made material false statements, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for his personal account and allocating less favorable trades to Continuum's other clients' accounts; by making materially false representations in Continuum's Forms ADV; and by his efforts to conceal his scheme from being detected by others at the firm.

70. By engaging in the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of

a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

71. By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Sections 17(a)(1) and (2) of the Securities Act
### (against Defendant Lambert)

72. The SEC realleges and incorporates by reference paragraphs 1 through 67 above.

73. As alleged above, Defendant engaged in a scheme to defraud clients, and obtained money by means of untrue statements by cherry-picking favorable trades for his personal account and allocating less favorable trades to Continuum's other clients' accounts; by means of materially false representations in Continuum's Forms ADV; and by his efforts to conceal his scheme from being detected by others at the firm.

74. By engaging in the conduct described above, Defendant, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly employed devices, schemes, or artifices to defraud, and obtained money by means of untrue statements of material fact or omissions to state a material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendant, with scienter, employed devices, schemes and artifices to defraud, and with scienter or negligence obtained money by means of untrue statements and omissions.

76.     By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) and (2) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(2).

## THIRD CLAIM FOR RELIEF
### Fraud by an Investment Adviser
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (against Defendant Lambert)

77.     The SEC realleges and incorporates by reference paragraphs 1 through 67 above.

78.     As alleged above, Defendant had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of Continuum's clients.  Lambert breached his fiduciary duty by cherry-picking favorable trades for his personal account and allocating less favorable trades to Continuum's other clients' accounts; by making materially false representations in Continuum's Forms ADV; and by his efforts to conceal his scheme from being detected by others at the firm.

79.     At all relevant times, Defendant acted knowingly, recklessly or negligently, when carrying out this fraud.

80.     By engaging in the conduct described above, Defendant, directly or indirectly, by use of the mails or means of instrumentalities of interstate commerce: (a) with scienter or recklessness, employed devices, schemes or artifices to defraud clients or prospective clients, and (b) with scienter, recklessness, or negligence, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

81. By engaging in the conduct described above, Defendant, violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

### III.

Order Defendant to disgorge all funds received from his illegal conduct.

### IV.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)(1)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 28, 2020                                  Respectfully submitted,


/s/ Kathryn C. Wanner
Kathryn C. Wanner
Cal. Bar No. 269310
Attorney for Plaintiff
Securities and Exchange Commission
444 S. Flower Street, 9th Floor
Los Angeles, CA 90071
Phone:  (323) 965-4573
Fax:  (213) 443-1904
Email:  wannerk@sec.gov